## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANDREA CONTE,<br><br>        *Plaintiff*,<br><br>   v.<br><br>FEDERAL BUREAU OF INVESTIGATION,<br><br>        *Defendant*. | Civil Action No. 23-3729 (TJK) |

## <u>MEMORANDUM OPINION</u>

Andrea Conte, a journalist, writer, and filmmaker, made a Freedom of Information Act request to the Federal Bureau of Investigation for records related to Warren Hart, who Conte alleges was an FBI confidential human source who posed as a member of the Black Panther Party decades ago. The FBI produced records to Conte but withheld some material under FOIA Exemptions 3, 6, 7(C), 7(D), and 7(E), and also asserted its standard *Glomar* response. Conte challenges all of it. The parties now cross-move for summary judgment, and the FBI also moves to designate one of its declarations as a highly sensitive document and to file it under seal and ex parte. The Court will grant the FBI's request with respect to its declaration. And for the reasons explained below, the Court also finds that the FBI has shown that its search, withholdings, and *Glomar* response were proper. Accordingly, it will grant the FBI's motion for summary judgment, deny Conte's cross-motion, and enter judgment for the FBI.

## I.    Background

Conte's work focuses on "the politics of the carceral state and international dimensions of state power." ECF No. 1 ¶ 7. In 2018, he made a FOIA request to the FBI as part of a project focusing on the FBI's COINTELPRO operation. *Id.* ¶¶ 18, 33. Conte describes COINTELPRO

as a "series of covert projects aimed at surveilling, infiltrating, discrediting, and disrupting domestic political organizations." *Id.* ¶ 18.  He sought "all records pertaining to Warren Hart."[1] *Id.* ¶ 33. Conte alleges that Hart was a "confirmed Confidential Human Source for the FBI" who "pos[ed] as a part of the leadership of the Black Panther Party in Baltimore" and "target[ed] individuals and organizations considered by the FBI to be 'Black Extremists' or 'Black Radicals.'" *Id.* ¶ 34.  The FBI responded to Conte's FOIA request in 2022.  *Id.* ¶ 35.  It released 19 pages of records in full or in part, withheld at least 25 pages in full, and asserted its standard *Glomar* response.  *Id.*; ECF No. 21 at 9; *see* ECF No. 21-2 Ex. M ("Second Seidel Decl.") ¶ 7, n.2.  To justify its withholdings, the FBI invoked FOIA Exemptions 3, 6, 7(C), 7(D), and 7(E).  ECF No. 1 ¶¶ 35–36; ECF No. 21 at 9.  In early 2023, Conte filed an administrative appeal challenging the FBI's withholdings.  ECF No. 1 ¶ 36; ECF No. 21 at 9.  He claimed that "the FBI ha[d] already confirmed that Mr. Hart was its informant" and thus the FBI's FOIA withholdings were improper.  ECF No. 1 ¶ 38.  Later that year, the FBI denied Conte's administrative appeal.  ECF No. 1 ¶ 37; ECF No. 21 at 9.

Conte filed this action in December 2023.  ECF No. 21 at 10.  The FBI then conducted a supplemental search for responsive records.  *Id.*  Following its search, the FBI issued a supplemental response, releasing 21 pages of responsive records in full or in part, again withholding certain information under FOIA Exemptions 3, 6, 7(C), 7(D), and 7(E), and again asserting a *Glomar* response.  *Id.*  The parties now cross-move for summary judgment.  *See* ECF Nos. 21, 28. Conte challenges the adequacy of the FBI's supplemental search as well as the FBI's withholdings. ECF No. 28-4 at 12.  He also claims that the FBI is impermissibly shielding certain records through

---

[1] Conte's complaint also alleged that the FBI failed to properly respond to another FOIA request he filed.  *See* ECF No. 1 ¶ 21 (Count I).  The parties subsequently resolved that portion of their dispute.  *See* ECF No. 21 at 8 & n.1.  Therefore, only Count II of Conte's complaint, "Failure to Produce Records on Warren Hart," remains at issue.  ECF No. 1 at 10–11 (Count II).

its *Glomar* response. *Id.* In addition, the FBI moves to designate one of its declarations—which it hand-delivered to the Clerk of the Court—as a highly sensitive document and to file it under seal and ex parte.[2] ECF No. 20. Conte opposes this relief, especially insofar as the FBI requests that the declaration be submitted ex parte. *See generally* ECF No. 23.

## II.    Legal Standard

"Summary judgment is appropriately granted when, viewing the evidence in the light most favorable to the non-movant[] and drawing all reasonable inferences accordingly, no reasonable jury could reach a verdict in [his] favor." *Lopez v. Council on Am.-Islamic Rels. Action Network, Inc.*, 826 F.3d 492, 496 (D.C. Cir. 2016) (citation omitted). "The evidence presented must show 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)).

"In the FOIA context, a district court reviewing a motion for summary judgment conducts a de novo review of the record, and the responding federal agency bears the burden of proving that it has complied with its obligations under the FOIA." *MacLeod v. DHS*, No. 15-cv-1792 (KBJ), 2017 WL 4220398, at *6 (D.D.C. Sept. 21, 2017) (citing 5 U.S.C. § 552(a)(4)(B)); *see also DOJ v. Reps. Comm. for Freedom of Press,* 489 U.S. 749, 755 (1989) ("Unlike the review of other agency action that must be upheld if supported by substantial evidence and not arbitrary or capricious, the FOIA expressly places the burden 'on the agency to sustain its action.'"). The Court may "treat the [agency]'s factual proffers as conceded, but it must address [its] legal arguments on their merits." *King v. DOJ*, 245 F. Supp. 3d 153, 158 (D.D.C. 2017) (citing Fed. R. Civ. P.

---

[2] This Court's relevant Standing Order defines a "highly sensitive document" as those which merit extra security precautions in their handling and filing because of their sensitive content. Standing Order No. 21-3 (BAH) at 1 (Jan. 12, 2021). In civil cases, highly sensitive documents may contain "confidential government enforcement information [or] similar sensitive information." *Id.* at 2.

56(e)(2)).

## III.    Analysis

### A.    The FBI's Motion to Designate Declaration a Highly Sensitive Document, to File Under Seal, and to File Ex Parte

In defense of its FOIA response, the FBI has submitted three sworn declarations by Michael Seidel, the Section Chief of the FBI's Records/Information Dissemination Section (RIDS). The first two declarations support the FBI's withholdings and its *Glomar* response. *See generally* ECF No. 21-2 ("First Seidel Decl."); Second Seidel Decl. The third declaration contains sensitive information that the FBI proffers to further "demonstrate the agency's compliance with FOIA obligations." ECF No. 20 at 3. The FBI seeks to designate this third declaration a highly sensitive document and to file it under seal and ex parte. *See generally id.*

"The receipt of *in camera* affidavits is part of a trial judge's procedural arsenal." *Arieff v. U.S. Dep't of Navy*, 712 F.2d 1462, 1469 (D.C. Cir. 1983) (citation modified). A court may grant the use of ex parte declarations in FOIA cases, 5 U.S.C. § 552(a)(4)(B), and courts in this district have done so with some regularity, *see Arieff*, 712 F.2d at 1469 (collecting cases); *Montgomery v. IRS*, 40 F.4th 702, 713 (D.C. Cir. 2022). Ex parte declarations may be appropriate when they present a way to "decid[e] [the parties'] dispute without . . . disclosing the very material sought to be kept secret." *Arieff*, 712 F.2d at 1471. When determining whether to allow a declaration to be filed ex parte, a court must consider the nature of the information in the declaration that the party seeks to keep secret. *See id.* The court "must see to it that such use is justified to the greatest extent possible on the public record and must then make available to the adverse party as much as possible" of the underlying material. *Lykins v. DOJ*, 725 F.2d 1455, 1465 (D.C. Cir. 1984) (citation modified). The D.C. Circuit has cautioned against the overuse of ex parte declarations. *Id.* at 1463. Still, it has acknowledged that their use "is left to the broad discretion of the trial court

judge." *Montgomery*, 40 F.4th at 713 (quoting *Spirko v. U.S. Postal Serv.*, 147 F.3d 992, 996 (D.C. Cir. 1998)).

For the reasons explained in the third Seidel declaration itself, the FBI has justified its submission under seal and ex parte. Courts in this Circuit have often found the use of ex parte declarations helpful in cases like this one. *Montgomery*, 40 F.4th at 713; *see also Hayden v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 608 F.2d 1381, 1385 (D.C. Cir. 1979); *Labow v. DOJ*, No. 11-cv-1256 (BJR), 2014 WL 12787220, at *3 (D.D.C. June 24, 2014) (collecting cases). In such cases, courts have faced the "unusual problem that demands an unusual solution" that the D.C. Circuit recognized in *Arieff*—situations in which "an ex parte declaration is the only way to 'decid[e] the dispute without . . . disclosing the very material sought to be kept secret.'" *Perioperative Serv. & Logistics, LLC v. U.S. Dep't of Veterans Affs.*, 57 F.4th 1061, 1067 (D.C. Cir. 2023) (quoting *Arieff*, 712 F.2d at 1471). So too here. The Court has "carefully reviewed" the third Seidel declaration and the FBI's justifications for why it must be filed under seal and ex parte. *Montgomery*, 40 F.4th at 714. "Mindful of that requirement that it make [the information] as public as possible," the Court has still "concluded it could not publicly release" any part of the third Seidel declaration. *Id.* The Court finds that ex parte review is the "only way the court could evaluate the government's [FOIA response] without jeopardizing the very . . . interests the government [seeks] to protect." *Perioperative*, 57 F.4th at 1065.

Conte objects that the FBI has not provided enough information to show why the declaration must be submitted ex parte. ECF No. 23 at 3. But the information he seeks is in the declaration itself. The Court "understands [Conte's] frustration" that it "relie[s] on a declaration [he] cannot see, let alone rebut." *Perioperative*, 57 F.4th at 1067. But under these circumstances, the FBI may submit the third Seidel declaration ex parte. Moreover, for the same reasons, the Court finds that

it meets the criteria to be designated a highly sensitive document under the relevant Standing Order.[3]

### B.    The Parties' Motions for Summary Judgment

#### 1.    The FBI's Search for Records

To establish that the FBI conducted an adequate search, it "must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Reps. Comm. for Freedom of Press v. FBI*, 877 F.3d 399, 402 (D.C. Cir. 2017) (citations omitted).  It can do so by "submitting a reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." *Id.* (quoting *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)).  The Court affords an adequate agency affidavit a presumption of good faith. *Fischer v. DOJ*, 723 F. Supp. 2d 104, 108 (D.D.C. 2010).  This presumption "can be rebutted only with evidence that the agency's search was not made in good faith." *Id.* (quotation omitted).

The FBI has met its burden on its search.  In a sworn declaration, Seidel, the FBI's RIDS Section Chief, states that the FBI determined that records about Hart "would reasonably be expected to be found" within the FBI's Central Records System (CRS).  First Seidel Decl. ¶ 20.  CRS is "an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled and maintained by the FBI." *Id.* ¶ 21.  The FBI indexes information on individuals, organizations, activities, and events "when information is deemed of

---

[3] Because the FBI may file the third Seidel declaration ex parte, the Court need not also analyze the factors for sealing a judicial record. *Perioperative*, 57 F.4th at 1066.  That said, after a review of its contents and the factors in *United States v. Hubbard*, 650 F.2d 293, 317–22 (D.C. Cir. 1980), the Court finds that it may be maintained under seal as well.

sufficient significance to warrant indexing for future retrieval." *Id.* ¶ 23. FBI personnel access the CRS's indices through Sentinel, its case-management system. *Id.* ¶ 24. Sentinel incorporates the FBI's previous case-management system, Automated Case Support (ACS), as well as manual indices—pre-1995 hard-copy indices digitized and incorporated into Sentinel. *Id.* ¶¶ 25–26. The CRS indices "provide access to a comprehensive, agency-wide set of indexed data on a broad array of investigative and administrative subjects and consist of millions of searchable records that are updated daily with newly indexed information." *Id.* ¶ 28. Thus, after receiving Conte's request for records, the FBI determined that the most reasonable way to locate records would be to perform a search within Sentinel of the ACS automated indices and the manual indices. *Id.* The FBI searched both indices using two variants of Hart's name: "'Hart, Warren' and 'Warren Hart.'" *Id.* ¶ 29. And it located responsive records. *Id.*

As described above, the FBI has shown that it made a good-faith effort to search for the requested records where they might reasonably be found. *See, e.g.*, *Fischer*, 723 F. Supp. 2d at 109 (affording agency a presumption of good faith and finding search adequate when an affidavit described the process used and databases searched). Its first Seidel declaration provides the steps the FBI took in crafting its search and the reasons it decided those steps were the most likely to return responsive records. *See* First Seidel Decl. ¶¶ 24–29. The declaration reflects reasonable diligence and a good-faith effort.

Conte challenges the FBI's search in several ways, but each comes up short. He mainly argues that the search was inadequate because he did not receive many records he expected the FBI to find. *See* ECF No. 28-4 at 17. These include records confirming Hart's purported status as a confidential human source and those reflecting Hart's time allegedly "serving the FBI internationally in Canada." *Id.* Conte argues that "the fact that the FBI's search for documents

pertaining to Hart did not uncover these responsive documents demonstrates either that the FBI's search was inadequate, or that the FBI has deliberately withheld documents subject to FOIA without justifying its withholdings under a specific statutory exemption." *Id.* at 18.  But the "adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used." *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003); *see also Fischer*, 723 F. Supp. 2d at 109–10.  Conte also points to the FBI's electronic surveillance index as a database the FBI should have searched.  ECF No. 28-4 at 17.  But according to the FBI, electronic surveillance index records "are included in the CRS," so they were in fact searched.  ECF No. 34 at 4; *see also* First Seidel Decl. Ex. G.  Finally, to the extent that Conte suggests that the first Seidel declaration reflects factual errors or bad faith on the part of the FBI, he offers only conclusory allegations along those lines.

For these reasons, the Court will grant summary judgment to the FBI on the adequacy of its search.

### 2.    The FBI's Withholdings

"FOIA requires federal agencies to make records publicly available upon request unless one of nine exemptions applies." *Emuwa v. DHS*, 113 F.4th 1009, 1012 (D.C. Cir. 2024).  It creates a "strong presumption in favor of disclosure" and "places the burden on the agency to justify the withholding of any requested documents." *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991).  When an agency withholds portions of a record, it must still disclose "[a]ny reasonably segregable portion . . . after deletion of the portions which are exempt."  5 U.S.C. § 552(b).

### a.    The FBI's *Glomar* Response

In responding to Conte's FOIA request, the FBI asserted a *Glomar* response to four categories of records.  A *Glomar* response is named for the CIA's refusal to confirm or deny the existence of the *Hughes Glomar Explorer* ship, which was later discovered to have been engaged in

a clandestine operation to recover a sunken Soviet submarine. *Roth v. DOJ*, 642 F.3d 1161, 1171 (D.C. Cir. 2011) (citing *Phillippi v. CIA*, 655 F.2d 1325, 1327 (D.C. Cir. 1981)). A *Glomar* response allows an agency to neither confirm nor deny the existence of certain records in response to a FOIA request, when providing any other response would jeopardize the secrecy of classified or sensitive information. *Id.* A *Glomar* response is only available to an agency if it has not officially acknowledged whether the underlying records exist. *Knight First Amend. Inst. v. CIA*, 11 F.4th 810, 815 (D.C. Cir. 2021).

A *Glomar* response is proper if "the fact of the existence or nonexistence of agency records falls within a FOIA exemption." *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007). As the D.C. Circuit put it, an agency "may refuse to confirm or deny the existence of records where to answer the FOIA inquiry would cause harm cognizable under an FOIA exception." *Gardels v. CIA*, 689 F.2d 1100, 1103 (D.C. Cir. 1982). To determine whether a *Glomar* response "fits a FOIA exemption, courts apply the general exemption review standards established in non-*Glomar* cases." *Wolf*, 473 F.3d at 374. An agency issuing a *Glomar* response must explain in as much detail as possible why it cannot confirm or deny the existence of certain records or categories of records, which it may seek to do by affidavit. *James Madison Project v. DOJ*, 208 F. Supp. 3d 265, 283 (D.D.C. 2016). If a *Glomar* response is justified, "the agency need not conduct any search for responsive documents or perform any analysis to identify segregable portions of such documents." *People for Ethical Treatment of Animals v. Nat'l Insts. of Health*, 745 F.3d 535, 540 (D.C. Cir. 2014).

The FBI has asserted its standard *Glomar* response over four categories of records: those pertaining to (1) "national security or foreign intelligence records pursuant to FOIA Exemption 1 and Exemption 3, in conjunction with 50 U.S.C. § 3024(i)(1)"; (2) "records that would identify any individual in the Witness Security Program pursuant to FOIA Exemption 3 and 18 U.S.C.

9

§ 3521"; (3) "records that would identify any individual on a watchlist pursuant to FOIA Exemption 7(E)"; and (4) "records, the release of which could reasonably be expected to endanger the life or physical safety of a confidential human source (CHS) pursuant to FOIA Exemptions 7(D), 7(E), and 7(F)." Second Seidel Decl. ¶ 4. The FBI's assertion of a *Glomar* response is standard: "to be credible and effective, the FBI must assert a *Glomar* response regardless of whether responsive records exist." *Id.* ¶ 6. For that reason, a *Glomar* response is attached to all FBI FOIA response letters. *Id.* ¶ 7 n.2. The FBI has provided, on the record, a second Seidel declaration which explains the justification for each category of records for which it asserts a *Glomar* response. *See generally id*.

As it must, the Court begins with whether the FBI has officially acknowledged the existence or nonexistence of any record subject to its *Glomar* response. *Knight First Amend. Inst.*, 11 F.4th at 815 ("An agency waives any right to make a *Glomar* response by disclosing whether responsive records exist."). It hasn't. The Court has reviewed the entire record, including all the sworn declarations provided by both parties and exhibits appended to Conte's motions. Nothing in the record suggests that the FBI has officially acknowledged the existence or nonexistence of any record requested by Conte and subject to its *Glomar* response.

Moreover, for the categories of records over which it asserts its *Glomar* response, the FBI has "logically and plausibly" explained why the existence or nonexistence of responsive records would fall within the relevant FOIA exemption. *Knight First Amendment Inst.*, 11 F.4th at 819; *see also id.* (upholding an agency's use of a *Glomar* response over intelligence sources and methods); *Wilson v. FBI*, No. 22-cv-3062 (ABJ), 2025 WL 522019, at *7 (D.D.C. Feb. 18, 2025) (upholding the FBI's use of *Glomar* regarding Witness Security Program records); *Magassa v. FBI*, No. 23-5235, 2024 WL 5221092, at *3 (D.C. Cir. Dec. 26, 2024) (per curiam) (upholding the

FBI's use of *Glomar* response regarding watch list records); *Montgomery*, 40 F.4th at 711 (upholding an agency's use of a *Glomar* response to shield confidential humans source records). Thus, the FBI may assert its *Glomar* response as to the existence or nonexistence of responsive records.

Conte's only objection to the *Glomar* response is to argue that the FBI has waived its right to do so by officially acknowledging the existence of responsive records. *See* ECF No. 28-4 at 18–19; ECF No. 37 at 4–5. His theory goes like this: the FBI is asserting such a response because it possesses records showing that Hart was a confidential human source—but the FBI has already "officially confirmed" his status as such, referring to testimony Hart gave to a commission of inquiry in Canada, as well as news reports and other secondary sources. ECF No. 28-4 at 18–19, 27. Moreover, according to Conte, "the FBI's own production of documents reference Hart's status" as a confidential human source. *Id.* at 19.

Putting aside the first step of Conte's theory, the second—his argument about official acknowledgement—never gets off the ground. Simply put, none of the information he points to constitute "an official and documented disclosure" by the FBI that Hart was a confidential human source for the agency. *Knight First Amend. Inst.*, 11 F.4th at 815. The Court "do[es] not 'deem "official" a disclosure made by someone other than the agency from which the information is being sought.'" *Id.* at 816 (quoting *Frugone v. CIA*, 169 F.3d 772, 774 (D.C. Cir. 1999)); *see also ACLU v. CIA*, 710 F.3d 422, 429 n.7 (D.C. Cir. 2013) ("We have permitted agencies to give a *Glomar* response despite the prior disclosure of another, unrelated agency."). And the "FBI's own production of documents" Conte references consist of copies of news articles. ECF No. 28-1 ¶ 33. That is nothing like an official and documented disclosure that Hart was a confidential human source.

For these reasons, the Court will grant summary judgment to the FBI with respect to its *Glomar* response.

### b.    Exemption 7

### i.    Exemption 7(C)

The FBI invokes three of Exemption 7's sub-parts, but first, the Court addresses a common threshold requirement.  "Exemption 7 protects from disclosure 'records or information compiled for law enforcement purposes,' but only to the extent that disclosure of such records would cause an enumerated harm listed in Exemption 7's subsections." *Miller v. DOJ*, 872 F. Supp. 2d 12, 24 (D.D.C. 2012) (citing 5 U.S.C. § 552(b)(7)).  Thus, to "fall within Exemption 7, documents must first meet a threshold requirement: that the records were 'compiled for law enforcement purposes.'"  *Pub. Emps. for Env't Resp. v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico (PEER)*, 740 F.3d 195, 202–03 (D.C. Cir. 2014) (citing 5 U.S.C. § 552(b)(7)).  "Agencies classified as law enforcement agencies . . . receive deference to their assertion that documents were compiled for a law enforcement purpose."  *100Reporters LLC v. DOJ*, 248 F. Supp. 3d 115, 159 (D.D.C. 2017) (citing *Pratt v. Webster*, 673 F.2d 408, 418 (D.C. Cir. 1982)).  But "not every document compiled by a law enforcement agency is compiled for a law enforcement purpose."  *Id.* Instead, "the agency's activity 'must be related to the enforcement of federal laws or to the maintenance of national security,'" and "the nexus between the [activity] and one of the agency's law enforcement duties must be based on information sufficient to support at least 'a colorable claim' of its rationality."  *Pinson v. DOJ*, 202 F. Supp. 3d 86, 101–02 (D.D.C. 2016) (alteration in original) (quoting *Pratt*, 673 F.2d at 420–21).

The FBI has met this threshold to invoke Exemption 7.  Seidel states that the records the FBI withheld under Exemption 7 "were compiled by the FBI in furtherance of its assistance to a

foreign law enforcement agency." First Seidel Decl. ¶ 41. These records "describe the FBI's actions to assist a foreign law enforcement agency in locating Warren Hart." *Id.*

This explanation suffices. "[A]n assertion by the FBI that the records are for a law enforcement purpose is entitled to deference because the FBI is a law enforcement agency." *Doe v. DOJ*, 790 F. Supp. 17, 20 (D.D.C. 1992) (citing *Pratt*, 673 F.2d at 414, 418–19). And the first Seidel declaration shows a sufficient nexus between the underlying records and the FBI's law enforcement duties. *See* First Seidel Decl. ¶¶ 41–66. Thus, the FBI has provided enough evidence that the underlying records were created for law enforcement purposes.

Conte argues, to the contrary, that the FBI has *not* shown the relevant records were created for a law enforcement purpose. He alleges that the FBI's "illicit . . . domestic surveillance" of civil rights groups during the COINTELPRO era was "not in furtherance of any 'law enforcement purpose.'" ECF No. 28-4 at 21, 22. Instead, the FBI's alleged tactics were "solely intended to create paranoia and distrust" among the FBI's targets. *Id.* at 23. Any records created in furtherance of this goal, he argues, could not fall under Exemption 7. *Id.* Conte also relies heavily on a footnote in the D.C. Circuit's opinion in *Pratt* to suggest that FBI records from COINTELPRO operations may not meet the Exemption 7 threshold. *Id.* at 22 (quoting *Pratt*, 673 F.2d at 423 n.19). But even if there might be some circumstance in which records directly related to unlawful conduct by a law enforcement agency might not be "compiled for law enforcement purposes" for the purposes of Exemption 7, nothing suggests that the records here—those that merely "describe the FBI's actions to assist a foreign law enforcement agency in locating Warren Hart"—would meet that description.

Having determined that the FBI has cleared the threshold to invoke Exemption 7, the Court turns to that exemption's subparts. Exemption 7(C) "exempts from disclosure 'records or

information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy.'" *Citizens for Resp. & Ethics in Wash. v. DOJ (CREW)*, 746 F.3d 1082, 1091 (D.C. Cir. 2014) (quoting 5 U.S.C. § 552(b)(7)(C)).  Disclosure of the records may still be required "if the individual seeking the information demonstrates a public interest in the information that is sufficient to overcome the privacy interest at issue."  *Boyd v. DOJ Crim. Div.*, 475 F.3d 381, 386–87 (D.C. Cir. 2007).  "In order to trigger the balancing of public interests against private interests, a FOIA requester must (1) 'show that the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake,' and (2) 'show the information is likely to advance that interest.'"  *Id.* at 387 (quoting *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 172 (2004)).

The FBI invoked Exemption 7(C) to protect the names of FBI special agents, persons who were "of investigative interest to a foreign government," and foreign law enforcement personnel. First Seidel Decl. ¶¶ 46–49.  For these individuals, the FBI asserts that it "balance[d] the privacy interests of the individuals . . . against any public interest in disclosure."  *Id.* ¶ 44.  The FBI determined that each "individuals' privacy interests outweighed any public interest in disclosure."  *Id.*

The FBI properly withheld this information under Exemption 7(C).[4]  The Court is satisfied that releasing the withheld names "could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).  Courts "have repeatedly found that it is proper to withhold names and other identifying information about law-enforcement officers and

---

[4] The FBI also invoked Exemption 6 to withhold the same information.  First Seidel Decl. ¶¶ 46–49.  But Exemption 7(C) has a "lower bar for withholding materials" and it applies here. *ACLU v. DOJ*, 655 F.3d 1, 6 (D.C. Cir. 2011) (quoting *DOD v. Fed. Lab. Rels. Auth.*, 510 U.S. 487, 496 n.6 (1994)).  Thus, the Court need not reach the FBI's Exemption 6 arguments.

government officials under Exemption 7(C)." *Ball v. U.S. Marshals Serv.*, No. 19-cv-1230 (JEB), 2021 WL 4860590, at *6 (D.D.C. Oct. 19, 2021), *appeal dismissed sub nom.*, No. 21-5253, 2022 WL 190757 (D.C. Cir. Jan. 14, 2022) (collecting cases); *see also Roseberry-Andrews v. DHS*, 299 F. Supp. 3d 9, 30–32 (D.D.C. 2018) (finding DHS properly withheld the names and personally identifiable information of ICE employees who "handle a myriad of tasks relating to the enforcement of federal immigration law"); *Isiwele v. U.S. Dep't of Health & Hum. Servs.*, 85 F. Supp. 3d 337, 359 (D.D.C. 2015) (finding agency properly redacted names of law enforcement personnel); *Gosen v. USCIS*, 75 F. Supp. 3d 279, 290 (D.D.C. 2014) ("Because these redactions do not appear to implicate any public interest at all, USCIS properly applied Exemption[] . . . 7(C)."); *Brown v. FBI*, 873 F. Supp. 2d 388, 404 (D.D.C. 2012) ("In light of the employees' privacy interests, the potential for violence, and the insubstantial public interest in the names of clerical employees, defendant properly withholds the names and identifying information of FBI [Special Agents] and support personnel.").

Conte advances a smattering of arguments that attempt to suggest that the public interest outweighs those privacy interests. None come close. He argues that, because Hart passed away in 2007, and because his status as an informer has been "revealed," there is no privacy interest "as to Hart." ECF No. 37 at 9. But Seidel states that the FBI does not withhold the names of deceased individuals under Exemption 7(C). First Seidel Decl. ¶ 45. Conte also renews his argument that the FBI's "tactics to deprive citizens of their constitutionally-protected rights" favor disclosure. ECF No. 37 at 9. He argues generally that there is a "remarkable public interest in the disclosure of the responsive documents." *Id.* at 10. But Conte never addresses the purported public interest in the specific information the FBI withheld under Exemption 7(C)—the names of law enforcement personnel and individuals under investigation.

ii.        Exemption 7(D)

Exemption 7(D) "exempts records or information compiled for law enforcement purposes"

if the disclosure "could reasonably be expected to disclose the identity of a confidential source."

5 U.S.C. § 552(b)(7)(D).  A source is "confidential" under Exemption 7(D) if "the source 'pro-

vided information under an express assurance of confidentiality or in circumstances from which

such an assurance could be reasonably inferred.'"  *Williams v. FBI*, 69 F.3d 1155, 1159 (D.C. Cir.

1995) (quoting *DOJ v. Landano*, 508 U.S. 165, 170–74 (1993)).  "[W]hen the FBI contends that a

source received an express assurance of confidentiality, it must . . . present sufficient evidence that

such an assurance was in fact given."  *Roth*, 642 F.3d at 1184 (citation omitted); *see also CREW*,

746 F.3d at 1102 (stating that the agency must "present probative evidence that the source did in

fact receive an express grant of confidentiality") (citation omitted).  Without an express assurance

of confidentiality, "courts consider a number of factors to determine whether the source nonethe-

less 'spoke with an understanding that the communication would remain confidential.'"  *Roth*, 642

F.3d at 1184 (quoting *Landano*, 508 U.S. at 172).  "The nature of the crime investigated and the

informant's relation to it are the most important factors in determining whether implied confiden-

tiality exists."  *Skinner v. DOJ*, 744 F. Supp. 2d 185, 212 (D.D.C. 2010).

The FBI relies on both implied and express assurances of confidentiality to support its

Exemption 7(D) withholdings.  First, it withheld the file numbers of confidential human sources,

who "report information to the FBI on a regular basis under express assurances of confidentiality."

First Seidel Decl. ¶ 53 n.22.  Disclosure of these file numbers "could ultimately identify these

sources" because it would provide a link between the source and the information provided and

could allow the public to identify a confidential source.  *Id.* ¶ 54.  Second, the FBI also withheld

names and other identifying information of individuals who disclosed information to the FBI

"concerning the activities of subjects who were of investigative interest to a foreign government," as well as the information itself. First Seidel Decl. ¶ 55. This information, the FBI asserts, was given under an implied assurance of confidentiality: "the FBI inferred these individuals provided this information to the FBI only because they believed [it] . . . would remain confidential." *Id.* Third, the FBI also withheld "information provided to the FBI by a foreign government agency under implied assurances of confidentiality." *Id.* ¶ 58.

The FBI has met its Exemption 7(D) burden for these records. For its express assurances of confidentiality, the FBI has provided "sufficient evidence that such an assurance was in fact given." *Roth*, 624 F.3d at 1185. And for the individuals and foreign government agency that provided information based on implied assurances of confidentiality, the FBI has met its burden there too. Given the sensitive nature of the information at issue and the overall context, the FBI has shown that an implied assurance of confidentiality existed.

Conte's sole argument challenging the FBI's Exemption 7(D) withholdings is his argument, once again, that the FBI has "publicly confirmed" Hart's status as a confidential human source.[5] ECF No. 28-4 at 10. But as explained above, that argument fails.

### iii.        Exemption 7(E)

Exemption 7(E) protects law enforcement information when release "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). The "requirement that

---

[5] Conte also makes passing reference to the "public domain doctrine" as a separate reason the FBI may not withhold records pertaining to Hart's alleged role as a confidential human source. ECF No. 28-4 at 26 n.3. But the D.C. Circuit has clarified that this doctrine is merely a component of the official acknowledgment doctrine. *See Nat'l Sec. Archive v. CIA*, 104 F.4th 267, 274 (D.C. Cir. 2024).

disclosure risk circumvention of the law 'sets a relatively low bar for the agency to justify with-holding.'" *PEER*, 740 F.3d at 205 (quoting *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011)). "Rather than requiring a highly specific burden of showing how the law will be circumvented, exemption 7(E) only requires that the [agency] demonstrate logically how the release of the re-quested information might create a risk of circumvention of the law." *Gilman v. DHS*, 32 F. Supp. 3d 1, 18 (D.D.C. 2014) (alteration in original) (quoting *Blackwell*, 646 F.3d at 42).

The FBI invoked Exemption 7(E) to withhold "sensitive investigative file numbers and non-public details of the FBI's cooperation with a foreign government agency." First Seidel Decl. ¶ 61.

The FBI has met its burden with respect to Exemption 7(E). For each category, the FBI has explained how the release of the information "logically . . . might create a risk of circumven-tion of the law." *Blackwell*, 646 F.3d at 42 (citation omitted). It asserts that disclosure of these investigative file numbers would "provide critical information about where and how the FBI de-tected particular criminal behaviors or national security threats." First Seidel Decl. ¶ 63. That is so, the FBI explains, because the file numbers correspond to specific investigations, and the codes reveal the type of investigation and the FBI location that originated the investigation. *Id.* ¶¶ 62–64. The meaning of many of the FBI's codes are public. *Id.* ¶ 62. So access to file numbers "would allow determined criminals and foreign adversaries to obtain an exceptional understand-ing" of the status and origins of FBI investigations. *Id.* ¶ 65. This insight would allow them to "structure their behavior to avoid detection and disruption by FBI investigators, enabling them to circumvent the law." *Id.* In addition, disclosure of non-public details of the FBI's cooperation with a foreign government agency would reveal "details concerning the scope of collection and information gathering capabilities" of the FBI. *Id.* ¶ 67. It could also reveal "vulnerabilities within

18

the scope of the relationship between the two governments with respect to foreign assistance requests." *Id.*

Conte objects to the FBI's Exemption 7(E) withholdings on two grounds, but both come up well short. First, he argues that the investigative techniques withheld under Exemption 7(E) are "historical," and thus "would not threaten circumvention of the law" because the FBI no longer relies on them. ECF No. 28-4 at 32. But Conte provides no evidence in support of this conclusory assertion, and the FBI's declarant says otherwise. Conte also argues that the "FBI's domestic surveillance of the Civil Rights Movement is not related to any current investigation." *Id.* But Exemption 7(E) does not require an ongoing investigation.

*   *   *

For these reasons, the Court will grant summary judgment to the FBI with respect to its assertion of Exemptions 7(C), 7(D), and 7(E).

### c.    Exemption 3

Under Exemption 3, FOIA's disclosure requirements do not apply to matters that are "specifically exempted from disclosure by statute . . . if that statute . . . (i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue[,] or (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3)(A). Thus, the agency "need only show that the statute claimed is one of [the] exemption[s] as contemplated by Exemption 3 and that the withheld material falls within the statute." *Larson v. U.S. Dep't of State*, 565 F.3d 857, 865 (D.C. Cir. 2009). "Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the

inclusion of withheld material within the statute's coverage." *Nat'l Sec. Couns. v. CIA*, 320 F. Supp. 3d 200, 214–15 (D.D.C. 2018) (citation modified).

The FBI relied on Exemption 3 to withhold all information it also withheld under Exemption 7(E), and it invokes the National Security Act as the statute underlying its Exemption 3 withholdings. First Seidel Decl. ¶ 36. Under that statute, the Director of National Intelligence "shall protect . . . intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 3024(i)(1). The Circuit has interpreted this language to exempt from disclosure material "that the agency 'demonstrates . . . can reasonably be expected to lead to unauthorized disclosure' of intelligence methods or sources." *Nat'l Sec. Couns.*, 320 F. Supp. 3d at 215 (quoting *Wolf*, 473 F.3d at 377). Because of the "national-security interests implicated by such material, courts give 'even greater deference to [FBI] assertions of harm to intelligence sources and methods under the National Security Act.'" *Id.* (quoting *Wolf*, 473 F.3d at 377).

The FBI has carried its burden to invoke Exemption 3 under this statute. As discussed above, the information withheld consists of investigative file numbers and details of cooperation with a foreign government agency. The FBI has shown that this information, if released, would "reveal intelligence sources and methods." ECF No. 21-2 ¶ 39. Disclosure of the FBI's investigative file numbers would reveal the scaffolding of FBI investigations, their originating offices, and subject matter. And disclosure of cooperation with a foreign government agency would entail release of sensitive details about how the FBI undertakes such cooperation. The FBI has "'sweeping power to protect [its] intelligence sources and methods' under the [National Security Act]." *Schaerr v. DOJ*, 69 F.4th 924, 930 (D.C. Cir. 2023) (quoting *CIA v. Sims*, 471 U.S. 159, 169 (1985)).

Conte does not contest that the National Security Act is a statute which qualifies for Exemption 3 withholding. ECF No. 28-4 at 33. But he argues that the FBI's justifications under Exemption 3 were "entirely conclusory." ECF No. 28-4 at 33. The Court disagrees and considers the FBI's showing to be sufficiently detailed. Conte also argues that, because he seeks historical information, any intelligence methods potentially disclosed would be "outdated" and "archaic," and therefore could not pose a risk to national security if released. ECF No. 37 at 6. Again, though, he has no facts to back up this conclusory allegation. And "given the 'greater deference afforded the Agency under the [National Security Act],'" *Nat'l Sec. Couns.*, 320 F. Supp. 3d at 216 (quoting *Wolf*, 473 F.3d at 378), the Court is convinced that the FBI has met its burden, *see Am. Ass'n of Women, Inc. v. DOJ*, 167 F. Supp. 3d 136, 143 (D.D.C. 2016) (finding similar language in declaration adequate).

For these reasons, the Court will grant summary judgment to the FBI with respect to its assertion of Exemption 3.

### 3.    Segregability

FOIA requires that an agency provide "[a]ny reasonably segregable portion of a record . . . after deletion of the portions which are exempt," 5 U.S.C. § 552(b)(9), "unless the exempt portions are 'inextricably intertwined with exempt portions,'" *Johnson v. Exec. Off. for U.S. Att'ys*, 310 F.3d 771, 776 (D.C. Cir. 2002) (quoting *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977)). Segregability is judged using a burden-shifting framework. First, an agency must provide a "detailed justification" for the non-segregability of the withheld information, although not "so much detail that the exempt material would be effectively disclosed." *Id.* Agencies typically meet their initial burden by providing a sufficiently detailed *Vaughn* index and "a declaration attesting that the agency released all segregable material." *Jud. Watch, Inc. v. DOJ*, 20 F. Supp. 3d 260, 277 (D.D.C. 2014). "Agencies are entitled to a presumption that they complied

21

with the obligation to disclose reasonably segregable material." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007). The plaintiff must then produce a "quantum of evidence" rebutting this presumption, at which point "the burden lies with the government to demonstrate that no segregable, nonexempt portions were withheld." *Id.*

On review of the FBI's *Vaughn* index and first Seidel declaration, the Court finds that the FBI has met its segregability burden under FOIA. Seidel attests that the FBI has "released all reasonably segregable non-exempt information from documents responsive to Plaintiff's FOIA request that are subject to FOIA." First Seidel Decl. ¶ 77. After performing its search for responsive records, the FBI identified 50 responsive pages. *Id.* ¶ 70. The agency performed a segregability review, after which it found that "9 pages could be released in full without redaction as there was no foreseeable harm to an interest protected by a FOIA exemption," "12 pages could be released in part with redactions per the identified FOIA exemptions," and "23 pages required withholding in their entirety." *Id.* ¶¶ 71–73. The FBI also located 6 pages of duplicate material which it did not produce. *Id.* ¶ 73. All withheld material was either exempt from FOIA or was "so intertwined with non-exempt information that segregation [was] not possible without revealing the underlying exempt information." *Id.* ¶ 33. When this explanation is paired with the descriptions of the withholdings in the FBI's *Vaughn* index, First Seidel Decl. Ex. L, and the descriptions of withheld information summarized above, the Court is persuaded that the FBI has met its burden. *See Jud. Watch, Inc.*, 20 F. Supp. 3d at 277.

Conte's arguments on segregability fall short. In response to the FBI's *Vaughn* index and first Seidel declaration, Conte states merely that the FBI's justifications for segregability were "conclusory" and "do not demonstrate that the FBI made any attempt to identify, segregate, and release non-exempt portions of requested material." ECF No. 28-4 at 35. The Court disagrees—

and Conte's bald assertions are not enough to shift the burden back to the FBI.  *See Sussman*, 494 F.2d at 1117.

      For these reasons, the Court will grant summary judgment to the FBI with respect to segregability.

## IV.    Conclusion

      For all these reasons, the Court will grant the FBI's Combined Motion to Designate Declaration as a Highly Sensitive Document and to File Declaration Under Seal and Ex Parte; will grant the FBI's Motion for Summary Judgment; and will deny Conte's Cross-Motion for Summary Judgment.  A separate order will issue.

/s/ Timothy J. Kelly      
TIMOTHY J. KELLY
United States District Judge

Date: October 30, 2025